UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| NORTHERN VALLEY COMMUNICATIONS, LLC, | ) ) ) | CIV. 11-4052-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| QWEST COMMUNICATIONS COMPANY, LLC, | ) ) ) ) | |
| Defendant. | ) | |

Plaintiff, Northern Valley Communications, LLC, brought suit against defendant, Qwest Communications Company, LLC, alleging that Qwest failed to pay Northern Valley's access charges for completing calls to free conferencing calling services. Qwest moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Northern Valley's claim number two and claim number three in part and under Rule12(f) to strike paragraph 62(D) in the complaint and request number three in the prayer for relief. Docket 17. Northern Valley resists and moves for oral argument on Qwest's motion. Docket 21. Qwest's motion is granted, and Northern Valley's motion is denied.

## BACKGROUND

According to the complaint, Northern Valley is a telecommunications provider located in Aberdeen, South Dakota. Under the telecommunications parlance, Northern Valley is known as a competitive local exchange carrier

(CLEC), also known as a local exchange carrier (LEC). Qwest is known as an interexchange carrier (IXC) and provides long-distance services.

Generally, an IXC utilizes its own telephone lines to carry a call across a state or across the country. But an IXC does not own the telephone lines located within the local exchange. Instead, a CLEC imposes upon an IXC an access charge to originate (an "originating" switched access charge) or terminate (a "terminating" switched access charge) a long-distance phone call on a line located within the local exchange. The access charge for interstate long-distance calls is determined by a tariff filed by the CLEC with the Federal Communications Commission (FCC), and the charge for intrastate long-distance calls is determined by a tariff filed with the South Dakota Public Utilities Commission. The interstate tariff filed with the FCC is at issue in this order. The FCC allows a rural CLEC to charge a higher tariff rate than a non-rural CLEC. Northern Valley is a rural CLEC.

Northern Valley filed its tariff number two with the FCC on November 15, 2004, which became effective on November 16, 2004. Pursuant to tariff number two, Northern Valley billed Qwest for access charges when Qwest customers utilized free conference calling services, which used Northern Valley's equipment. Northern Valley charged Qwest its typical rural access charge for the free conference calls.

Since May 1, 2007, Qwest has refused to pay Northern Valley's invoices. Northern Valley brought suit against Qwest to recover charges pursuant to its

tariff number two. This suit was assigned to Judge Charles B. Kornmann. *See Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp.*, Civ. 09-1004-CBK. Judge Kornmann stayed the case and referred some issues to the FCC. *Id.* at Docket 159.

On July 8, 2010, Northern Valley filed tariff number three with the FCC, which became effective on July 23, 2010, and remained effective until June 7, 2011. On December 29, 2010, Northern Valley filed transmittal number four with the FCC, which modified tariff number three. The amended tariff number three provides that Northern Valley will be reimbursed for its reasonable attorney's fees if it has to initiate litigation to recover its access charges from another carrier.

Northern Valley has been charging for services under tariff number three since July 23, 2010. Qwest has not paid any of Northern Valley's invoices billed under tariff number three. As of April 18, 2011, when Northern Valley filed this action, Northern Valley asserted that Qwest owes it $230,000. Additional charges continue to accrue daily.

## STANDARD OF REVIEW

**Rule 12(b)(6) Standard**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the complaint. *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989) ("[I]f as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations a claim must be

dismissed." (internal citation and quotations omitted)). "To survive a motion to dismiss, the factual allegations in a complaint, assumed true, must suffice 'to state a claim to relief that is plausible on its face.' " *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011) (quoting *Northstar Indus., Inc. v. Merrill Lynch & Co.*, 576 F.3d 827, 832 (8th Cir. 2009)).

To meet the plausibility standard, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (reasoning that a plaintiff must allege enough facts to "nudge [its] claims across the line from conceivable to plausible[.]"). In making this determination, the court must accept the facts alleged as true, even if they are doubtful. *Twombly*, 550 U.S. at 555.

**Rule 12(f) Standard**

Under Fed. R. Civ. P. 12(f), the court may strike any "redundant, immaterial, impertinent, or scandalous matter" from a pleading. The district court enjoys liberal discretion to strike pleadings pursuant to Rule 12(f). *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (citing *Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc.*, 278 F.3d 742, 748 (8th Cir. 2001)). Courts, however, disfavor striking an entire complaint. *Id.* (citing *Stanbury Law Firm, P.A. v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000)).

**DISCUSSION**

**I.     Motion to Dismiss Claim Number Two**

In its second claim for relief, Northern Valley asserts that Qwest has violated the Federal Communications Act (FCA), specifically 47 U.S.C. § 201(b), by refusing to pay Northern Valley's access service charges. Qwest argues that the FCC's decision in *All American Telephone Co. v. AT&T Corp.*, 26 FCC Rcd. 723 (2011), 2011 WL 194539, precludes Northern Valley from asserting a claim under the FCA for Qwest's failure to pay Northern Valley's tariffed charges. Northern Valley responds that *All American* is not controlling because it is currently under reconsideration and is contrary to Supreme Court and prior FCC precedent.

In *All American*, three CLECs that offered free conferencing services filed suit against an IXC, which refused to pay their terminating and originating tariffed access charges, alleging violations of 47 U.S.C. §§ 201(b), 203(c). 26 FCC Rcd. at 724-25. The United States District Court for the Southern District of New York referred the case to the FCC, which elected to determine two issues: (1) whether the IXC violated § 201(b), § 203(c), or any other FCA provision by failing to pay the CLECs' tariffed access charges; and (2) if the IXC violated the FCA by refusing to pay the CLECs' billed charges and not filing a complaint with the FCC. *Id.* at 725-26. The first question is at issue here.

In *All American*, the FCC found that the CLECs failed to state a claim for relief under the FCA:

> Under section 208 of the Act, the Commission has authority to adjudicate only claims alleging that a carrier has somehow violated the Act itself. . . . Thus, although a customer-carrier's failure to pay another carrier's tariffed charges may give rise to a claim in court for breach of tariff/contract, it does not give rise to a claim at the Commission under section 208 (or in court under section 206) for breach of the Act itself. This long-standing Commission precedent that "collection actions" fail to state a claim for violation of the Act has been acknowledged and followed by courts.

*Id.* at 726-27.

The parties dispute whether the court must give *Chevron* deference to *All American*.[1] In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

---

[1] The parties briefed this motion assuming that *Chevron* applied, but they dispute whether the FCC's decision in *All American* was a reasonable agency action. *Chevron* deference applies when the court reviews "the fruits of notice-and-comment rulemaking or formal adjudication." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (citations omitted); *see also In re UAL Corp.*, 468 F.3d 444, 450 (7th Cir. 2006) ("Deference is appropriate when agencies wield delegated interpretive or adjudicatory power–the former usually demonstrated by rulemaking and the latter by administrative adjudication (which also may yield rules in common-law fashion)." (citing *Mead*, 533 U.S. at 229-30)). The United States Supreme Court has applied *Chevron* deference to numerous formal adjudications by federal administrative agencies. *See Mead*, 533 U.S. at 230 n.12 (citing cases where *Chevron* deference applied to an agency's formal adjudication). Congress delegated adjudicatory power to the FCC to issue orders in formal adjudications. *See* 47 U.S.C. § 409 (detailing the FCC's procedures for adjudications). *All American* involved two parties, was conducted pursuant to the FCC's procedures for hearings, and was not decided under seal but rather was open for interveners. Thus, the FCC determined *All American* under its adjudicatory powers and *Chevron* deference is appropriate. Moreover, even if *Chevron* deference does not apply to an agency action, the action "is afforded weight 'depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.' " *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850 (8th Cir. 2008) (alteration in original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, *All American* is well-reasoned, consistent with FCC precedent, and, thus, is highly persuasive.

467 U.S. 837 (1984), the Supreme Court announced a two-prong test for determining whether a court should defer to an agency's interpretation of its governing statute. *Id.* at 842-43. " 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Id.* at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).

Congress delegated authority to the FCC "to 'execute and enforce' the Communications Act . . . and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act[.]" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005) (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377–378 (1999)). *See also Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 58 (2007) ("Congress, in § 201(b), delegated to the agency authority to 'fill' a 'gap,' i.e., to apply § 201 through regulations and orders with the force of law." (citation omitted)).

Under *Chevron*, the court first determines "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. If Congress has not addressed the precise question at issue and "the statute is silent or ambiguous with respect to the specific issue," the second determination made by the court is "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The Supreme Court has "long

recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id.* at 844. If the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," then the court "should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845 (citations omitted).

Under *Chevron's* first step, the court will consider whether Congress has directly addressed the question of whether the FCA is violated when an IXC refuses to pay a CLEC's tariffed access service charges. Congress did not specifically address in § 203(c) or § 201(b) whether a telecommunications carrier can bring an action against another carrier for failure to pay access charges pursuant to a lawfully filed tariff. *See All American*, 26 FCC Rcd. at 727. Because the statute is silent on this matter, *Chevron's* first step is met.

Under *Chevron's* second step, telecommunications regulations and tariffs are complex matters and courts routinely defer to the FCC's interpretation of the FCA. *See, e.g., Global Crossing*, 550 U.S. at 58 (deferring to the FCC's interpretation of the FCA); *Nat'l Cable*, 545 U.S. at 981-82 (same); *Iowa Utils. Bd.*, 525 U.S. at 388 (same). While courts have positively cited to *All American*, no court has published an opinion determining whether *Chevron* deference should be afforded to the FCC's decision in *All American*.

In *All American*, the FCC reviewed various conflicting policies in announcing its holding. The FCC noted that it does not condone any measure of "self help," and a carrier should not withhold payment "outside the context of any applicable tariffed dispute resolution provisions." 26 FCC Rcd. at 728. But the FCC reasoned that the FCA was intended to protect customers, not carriers:

> During the past twenty years, the Commission has repeatedly held that an allegation by a carrier that a customer has failed to pay charges specified in the carrier's tariff fails to state a claim for violation of any provision of the Act, including sections 201(b) and 203(c)—even if the carrier's customer is another carrier. These holdings stem from the fact that the Act generally governs a carrier's obligations to its customers, and not vice versa.

*Id.* at 727. The tariff rules "apply only to the provider of the service, not to the customer; and they govern only what the provider may charge, not what the customer must pay." *Id.* at 731. The "tariff rules were historically intended to protect purchasers of service from monopoly providers, not to protect sellers from monopsony purchasing power." *Id.* at 729. Thus, a telecommunication carrier's "failure to pay does not breach any provisions of the [FCA][.]" *Id.* at 731.

Because the FCC's holding in *All American* is a reasonable interpretation of §§ 201(b) and 203(c) and based on long-standing FCC policy, the court will defer to the FCC's decision.

### A.     Precedent

Northern Valley contends that the court should not afford deference to the FCC because its decision in *All American* is inconsistent with Supreme Court precedent in *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007): "In *Global Crossing*, the Supreme Court specifically rejected the argument adopted by the FCC in *All American* that failure to pay does not constitute a violation of the act merely because the carrier receives service as a 'customer' (rather than a 'carrier')[.]" Docket 20 at 6 (citing *Global Crossing*, 550 U.S. at 62-63).

The facts in *Global Crossing* differ significantly from the facts in this case. In *Global Crossing,* the FCC issued rules requiring certain communication carriers, including IXCs, to compensate a payphone operator when a caller uses the payphone to obtain free access to the carrier's lines (for example by dialing a 1-800 number). *Global Crossing*, 550 U.S. at 47. But in *All American,* the FCC distinguished the payphone line of cases from the facts in *All American*:

> The Commission has already explained why the payphone analogy raised by the CLECs fails. The Act requires the Commission to adopt rules ensuring that payphone service providers receive compensation for every completed call orientated from their payphones. To implement that statutory directive, the Commission adopted rules requiring certain carriers to pay to originating payphone service providers a fixed amount for each completed payphone call handled by those carriers. In subsequent decisions, the Commission held that a carrier's failure to pay the amount required to be paid by the Commission's payphone compensation

10

> rules constitutes a violation of our payment rules and a violation of section 201(b) of the Act.
>
> By stark contrast, the provisions of the Act and our rules regarding access charges apply only to the provider of the service, not to the customer and they govern only what the provider may charge, not what the customer must pay. Thus, failure to pay does not breach any provisions of the Act or Commission rules.

26 FCC Rcd. at 730 (citations omitted). Because *Global Crossing* and *All American* involved different factual scenarios, FCA provisions, and FCC decisions, and because the FCC specifically explained why the payphone cases were not controlling, the FCC did not violate Supreme Court precedent in *All American*.[2]

Northern Valley also contends that *All American* violates FCC precedent. *See* Docket 20 at 7 n.4 (listing FCC decisions that Northern Valley alleges are inconsistent with *All American*). But the FCC addressed its prior cases and particularly its holding in *MCG Communications, Inc. v. AT&T Corp.*, 14 FCC Rcd. 11647 (1999), 1999 WL 503598, *aff'd* 15 FCC Rcd. 308 (1999), 1999 WL

---

[2] Furthermore, even if *Global Crossing* interpreted the same statute under the same facts as in *All American*, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable*, 545 U.S. at 981. In *Global Crossing*, the Supreme Court did not reason that its holding flowed from the FCA's unambiguous terms or that its decision left no room for agency discretion because the Court affirmed the FCC's decision on payphone companies' compensation. Thus, even if *All American* held differently than *Global Crossing*, which it does not, the FCC's decision would still be entitled to its usual *Chevron* deference.

1256273: "To the extent the Commission's decision in *MCG* can be read to stand for the proposition that a carrier's failure to pay access charges violates the Act, we hold that it is not good law." 26 F CC Rcd. at 731. A court still utilizes *Chevron* deference if the agency adequately explained its reasons for reversing an earlier policy because " 'the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.' " *Nat'l Cable*, 545 U.S. at 981 (quoting *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996)).

In distinguishing *MCG*, the FCC noted that *MCG* addressed a different question than the one presented in *All American*: "[T]he only question discussed extensively in *MCG v. AT&T* was *not* whether a failure to pay access charges was a violation of the Act, but whether AT&T took the appropriate steps effectively to terminate the arrangement with MCG for the acceptance of originating access traffic." 26 FCC Rcd. at 731 (internal quotation omitted). The FCC further noted that the validity of *MCG* had been questioned for over ten years: "Almost ten years ago, however, at least one federal district court had already noted that the Commission had questioned the continuing validity and scope of the MGC decision. And during those ten years, the Commission . . . noted the incongruity of *MCG v. AT&T* at least twice." *Id.* (internal quotations and citations omitted). Because the FCC explained its reasoning for overruling *MCG*, to the extent that *MCG* could be read to hold differently than *All*

*American,* the court will afford the FCC normal *Chevron* deference for its holding in *All American.* The court finds Northern Valley's arguments on how the FCC violated precedent in *All American* unpersuasive.

### B.     Petition for Reconsideration

Northern Valley further argues that the court should not defer to *All American* because the decision "is currently under reconsideration and subject to appeal after reconsideration." Docket 20 at 1. Instead, Northern Valley, citing *Sancom, Inc. v. Sprint Communications Co.,* 618 F. Supp. 2d 1086 (D.S.D. 2009), urges the court to find that Qwest's motion is premature and "deny Qwest's motion without prejudice to Qwest's re-filing it after the precedent principally relied upon by Qwest in the motion, *All American,* is settled law." Docket 20 at 2.

In *Sancom*, a case with similar facts to this action, Judge Lawrence L. Piersol expressed doubt on whether the FCC's decision in *Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co.*, 22 FCC Rcd. 17973 (2007), 2007 WL 2872754, was, at that time, "properly characterized as settled precedent." 618 F. Supp. 2d at 1090. The court noted that "the action ultimately taken by the FCC in *Farmer & Merchants* will have a substantial impact with regard to the case at hand. Given the unusual and uncertain status of the *Farmers & Merchants* case," the court denied the motion to dismiss without prejudice. *Id.* at 1092.

*Farmers & Merchants* was unusual because the FCC had agreed to reconsider its ruling. A petition for reconsideration is "not to be used for the mere reargument of points previously advanced and rejected." *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 25 FCC Rcd. 3422, 3425-26 (2010), 2010 WL 972315. Instead, reconsideration is used for limited grounds such as newly discovered evidence or a change in the law that would justify reconsideration. *See* 47 C.F.R. § 1.106(b)(1)-(3) (listing the grounds for the FCC to grant a petition for reconsideration).

In *Farmers & Merchants*, the FCC granted the IXC's petition for reconsideration because the IXC alleged that the decision had been procured by evidentiary fraud. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 23 FCC Rcd. 1615, 1616-17 (2008), 2008 WL 246393. Moreover, the FCC had already questioned the validity of *Farmers & Merchants* before Judge Piersol issued his order in *Sancom. See, e.g.*, *In re InterCall, Inc.*, 23 FCC Rcd. 10731, 10738 (2008), 2008 WL 2597359 (reasoning that *Farmers & Merchants* was "subject to reconsideration on the factual issue of whether the conference calling companies were end users under Farmer's tariffs.").

Here, Northern Valley has offered no evidence that the FCC's decision in *All American* was based on evidentiary fraud or other grounds that would support a successful petition for reconsideration. Northern Valley does not assert that the FCC has stayed *All American* or otherwise indicated that the

14

order lacks precedential value, like the FCC had with regard to *Farmers & Merchants*. *See id.*

The court has reviewed the CLECs' petition for reconsideration in *All American*. While the CLECs raised multiple arguments in their petition, the main thrust of the CLECs' argument is that the FCC violated precedent in holding that a telecommunications carrier cannot bring suit pursuant to the FCA against another telecommunications carrier to recover either originating or terminating tariffed access charges. But the CLECs do not allege any ground upon which reconsideration would be permitted under the FCC's limited grounds for reconsideration. In its response to Qwest's motion, Northern Valley echos the arguments made in the CLECs' petition. The court addressed these arguments above and found that the FCC did not violate precedent and, even if *All American* was a departure from precedent, *Chevron* deference is still appropriate. Due to the factual differences between *Sancom* and this case, and because this court has already addressed many of the arguments supporting the CLECs' petition for reconsideration and finds that the FCC is unlikely to reconsider its decision in *All American*, *Sancom* is not persuasive.

Without clear indication from the FCC that it will reverse its decision in *All American* or that *All American* should not be accorded its customary precedential value, the court would be circumventing *Chevron* deference if the court failed to follow the holding in *All American*. Northern Valley's arguments regarding why the court should not follow *All American* are unpersuasive.

Accordingly, Northern Valley's claim number two is dismissed without prejudice.

While Northern Valley suggests that Qwest's motion be denied without prejudice pending final resolution of *All American*, the court finds that because Northern Valley has not shown any reason why the FCC would reverse its decision in *All American* and the FCC has not indicated that *All American* should not be afforded its customary precedential value, the better course of action is to dismiss Northern Valley's claim number two without prejudice. If the FCC does reverse its ruling in *All American*, then Northern Valley could amend its complaint upon a showing of good cause to add its claim number two again. Thus, claim number two is dismissed without prejudice.

**II.     Motion to Strike Paragraph 62(d)**

In paragraph 62(d) of its complaint, Northern Valley states that it is entitled to a declaratory judgment that Qwest has violated § 201(b). Docket 1 at ¶ 62(d). Qwest moves to strike this paragraph because Northern Valley cannot assert a claim against Qwest under § 201(b).

Because the court has dismissed Northern Valley's claim under § 201(b), the court cannot issue a declaratory judgment that Qwest violated § 201(b). Thus, paragraph 62(d) is rendered immaterial by the court's dismissal of claim number two, and Qwest's motion to strike paragraph 62(d) is granted.

**III.     Motion to Strike Third Prayer for Relief**

In its third prayer for relief, Northern Valley seeks its "reasonable attorneys' [sic] fees and the costs of this action, pursuant to 47 U.S.C. § 206[.]" Docket 1 at 16. Qwest moves to strike this prayer for relief because Northern Valley cannot assert a claim under the FCA and, thus, is not entitled to attorney's fees.

Section 206 only allows attorney's fees for violations of the FCA. 47 U.S.C. § 206 ("In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages . . . together with a reasonable counsel or attorney's fee[.]"). Because Northern Valley's claim number two, the only claim that alleges a violation of the FCA, was dismissed, Northern Valley is not entitled to attorney's fees under § 206. Thus, Qwest's motion to strike Northern Valley's third prayer for relief is granted.

**IV.     Motion to Dismiss Claim Number Three in Part**

In its third claim, Northern Valley alleges a quantum meruit cause of action against Qwest and alleges that "Qwest has been and will continue to be unjustly enriched unless it is required to pay to use Northern Valley's access services." Docket 1 at ¶ 55. In paragraph 26 of its complaint, Northern Valley states that "[s]ince May 1, 2007, Qwest has refused and continues to refuse to pay the invoices Northern Valley issued to Qwest reflecting the switched access

17

services Qwest took from Northern Valley." Docket 1 at ¶ 26. But in that same paragraph, Northern Valley contends that its tariff number two is not at issue in this action. Docket 1 at ¶ 26. Qwest moves to dismiss claim number three for the time period prior to July 23, 2010, when Northern Valley's tariff number three became effective, because Northern Valley has a pending action to recover the access charges billed before July 23, 2010, under its tariff number two. *See Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp.*, Civ. 09-1004-CBK.

Northern Valley agrees that this action only covers the time period after July 23, 2010. Docket 20 at 8 ("Northern Valley's prior lawsuit covers the time period up until Northern Valley's F.C.C. Tariff No. 3 was effective, July 23, 2010, which is when the present lawsuit starts."). Because the parties agree that Northern Valley's complaint only covers the time period after July 23, 2010, Qwest's motion to dismiss claim number three in part is granted to clarify Northern Valley's claim number three. Claim number three only applies to access service charges billed pursuant to Northern Valley's tariff number three, during the time period that tariff number three was effective.

## V.     Motion for Oral Argument

Northern Valley moves for oral argument on Qwest's motion. The court has the discretion to order oral argument on a motion. D.S.D. Civ. LR 7.1C. After considering the parties' briefs and reviewing the case law, the court finds that oral argument would not assist in determining the issues presented in Qwest's motion. Thus, Northern Valley's motion for oral argument is denied.

**CONCLUSION**

Qwest moves to dismiss Northern Valley's claim number two and strike paragraph 62(D) and the third prayer for relief based on the FCC's holding in *All American* that a telecommunications carrier may not bring an action under the FCA against another telecommunications carrier to recover tariffed access charges. In according the FCC its usual deference under the *Chevron* framework, the court finds that the FCC reasonably interpreted the FCA in *All American*. Thus, Northern Valley's claim against Qwest alleging a violation of the FCA is dismissed without prejudice. Qwest's motion to dismiss claim number two and strike paragraph 62(d) and the third prayer for relief are granted. Qwest also moves to dismiss Northern Valley's claim number three in part and limit claim number three to the time period beginning on July 23, 2010. Northern Valley agrees that this action only pertains to tariff number three. Thus, Qwest's motion to dismiss claim number three in part is granted. Finding that oral argument is unnecessary to determine the issues presented, Northern Valley's motion for oral argument is denied. Accordingly, it is

ORDERED that defendant's motion (Docket 17) is granted.

IT IS FURTHER ORDERED that plaintiff's motion (Docket 21) is denied.

Dated February 16, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE