UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| NORTHERN VALLEY COMMUNICATIONS, LLC, | ) ) | CIV. 11-4052-KES |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | MEMORANDUM OPINION AND ORDER |
| QWEST COMMUNICATIONS CO., L.P., | ) ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Northern Valley Communications, LLC, filed suit against

defendant, Qwest Communications Co., L.P., to collect charges billed pursuant

to its interstate access tariff number three. There are numerous pending

motions before the court, including Northern Valley's motion for summary

judgment (Docket 23), Qwest's cross motion for partial summary judgment

(Docket 37), Northern Valley's motion to strike Qwest's statement of material

facts (Docket 50), Northern Valley's motion to dismiss Qwest's counterclaims

(Docket 80), and Qwest's motion to seal certain documents (Docket 96).

This case is one of numerous similar cases pending in the District of

South Dakota, and it involves the same interstate access tariff as the one at

issue in *Northern Valley Communications Co. v. Sprint Communications Co.*, No.

11-4052-KES (D.S.D.) (*Sprint II*).[1] This court has stayed the majority of these

---

[1] There is a separate action pending in this court involving Northern Valley and Sprint relating to Northern Valley's prior tariffs. *Northern Valley*

cases and referred specific issues to the Federal Communications Commission (FCC), including *Sprint II*, pursuant to the primary jurisdiction doctrine. Although neither party has moved the court to stay the action and refer specific issues to the FCC, the court ordered the parties to address whether this case should be stayed and referred. Docket 89.

Northern Valley and Qwest both oppose a stay and referral and argue that the court can determine the merits of the pending motions. The court finds that referral of certain issues to the FCC is called for under the primary jurisdiction doctrine.

**BACKGROUND**

**I.     History of the Present Case**

Qwest provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Qwest delivers long-distance calls to a local exchange carrier (LEC) or a competitive local exchange carrier (CLEC) for termination to end users. Under the FCC's current regulatory framework, Qwest pays the LEC a terminating access charge based on the LEC's interstate access tariff, which is filed with the FCC.

Northern Valley is a CLEC. Northern Valley filed its tariff number two with the FCC on November 15, 2004, which became effective on November 16,

---

*Commc'ns, LLC v. Sprint Commc'ns Co.*, 08-cv-1003-KES (*Sprint I*).

2004. Pursuant to tariff number two, Northern Valley billed Qwest for access charges when Qwest's long-distance customers originated calls to several companies that provide free telephone services such as conference calling, chat-line, and similar services,[2] which used Northern Valley's network. Northern Valley charged Sprint its typical rural access charge for the free conference calls. Qwest has refused to pay these charges since May 1, 2007. Qwest's refusal to pay is the subject of a separate case pending before U.S. District Judge Charles B. Kornmann. *Northern Valley Commc'ns, LLC v. Qwest Commc'ns Co.*, 09-cv-1004-CBK (*Qwest I*).

On July 8, 2010, Northern Valley filed tariff number three with the FCC, which became effective and received deemed lawful protection on July 23, 2010. On June 7, 2011, the FCC found in favor of Qwest on its formal complaint that was filed against Northern Valley's tariff number three. *Qwest Commc'ns Co., LLC v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332 (June 7, 2011), 2011 WL 2258081 (*Qwest v. Northern Valley I*). In *Qwest v. Northern Valley I*, the FCC found Northern Valley's definition of "end user" and "customer of a foreign or interstate telecommunications service" to be unlawful and directed Northern Valley to revise the tariff. 26 FCC Rcd. at 8332-33. The FCC reasoned that Northern Valley's definition of "end user" was unlawful because an end user must receive services from Northern Valley "for a fee." *Id.*

---

[2] The court will refer to these companies collectively as "free calling providers" or "conference calling companies."

at 9337 ("[U]nder the Commission's ILEC access charge regime, an 'end user' is a customer of a service that is offered for a fee.").

Sprint also filed a formal complaint regarding Northern Valley's tariff number three, which the FCC granted in part and denied in part on July 18, 2011. *Sprint Commc'ns Co. v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 10780 (July 18, 2011), 2011 WL 2838100 (*Sprint v. Northern Valley I*). In *Sprint v. Northern Valley I*, the FCC found certain provisions of Northern Valley's tariff to be unlawful and directed Northern Valley to revise the tariff. 26 FCC Rcd. at 10780-81.

On July 26, 2011, Northern Valley filed changes to effectuate the modifications mandated by the FCC in *Sprint v. Northern Valley I*.  Qwest and Sprint filed their petitions to suspend or reject the tariff on August 2, 2011. The FCC rejected Qwest's and Sprint's petitions, and Northern Valley's tariff number three as revised was deemed lawful and effective on August 10, 2011. *Protested Tariff Transmittal Action Taken*, 26 FCC Rcd. 11282, 11282 (Aug. 12, 2011), 2011 WL 3561907 ("[W]e conclude that the parties filing petitions against the tariff transmittals listed in this Report have not presented compelling arguments that these transmittals are so patently unlawful as to require rejection.").[3]

---

[3] The court will refer to Northern Valley's tariff number three and revised tariff number three as "tariff number three" unless there is a need to distinguish between the tariffs.

4

Northern Valley's tariff number three has a definition for Voice over Internet Protocol (VoIP) technology. *See* Docket 81-1 at 3 ("The term VoIP-PSTN Traffic shall have the meaning denoted in the Federal Communications Commission Report and Order in WC Docket Nos. 10-90, etc., F.C.C. Release No. 11-161 (November 18, 2011). It is traffic exchanged over PSTN (Public Switched Telephone Network) facilities that originates and/or terminates in IP (Internet Protocol) format."). The tariff also has a compensation system for services utilizing VoIP technology. Docket 81-1 at 5.

In *Qwest I*, which is pending before Judge Kornmann, Northern Valley moved to stay the action and refer certain issues to the FCC. The court granted the motion. *Qwest I*, Docket 159. In *Sprint I*, this court referred the issues regarding the interstate access tariff to the FCC and also referred certain issues regarding Northern Valley's intrastate tariff to the South Dakota Public Utilities Commission (SDPUC). *Sprint I*, Docket 112. The parties have almost completed discovery before the SDPUC. *Sprint I*, Docket 58 at 8.

## II.   Related Cases

This case is one of a number of cases pending in this and other courts involving a dispute between a CLEC or an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers. In each of these cases, a CLEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the CLEC's

5

interstate tariff(s) and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories. In each case, the IXC claims that the services provided were not covered by the applicable tariff because the CLEC did not terminate the calls and the free calling providers were not end users within the meaning of the tariffs. Many of the IXCs also claim that the applicable CLEC engaged in unlawful traffic pumping.

The following cases are pending in the District of South Dakota, some of which have been stayed pending referral of specific issues to the FCC:

| | |
|---|---|
| *Sprint v. Native American Telecommunications*, Civ. 10-4110-KES | Stayed |
| *Northern Valley v. Qwest*, Civ. 11-4052-KES | |
| *Northern Valley v. Sprint*, Civ. 11-4053-KES | Stayed |
| *Northern Valley Communications L.L.C. v. Qwest Communications Co.*, Civ. 09-1004-CBK | Stayed |
| *Splitrock Properties, Inc. v. Sprint Communications Co.*, Civ. 09-4075-KES | Stayed |
| *Northern Valley Communications, LLC v. Sprint Communications Co.*, Civ. 08-1003-KES | Stayed |
| *Splitrock Properties, Inc. v. Qwest Communications Corp.*, No. 08-4172-KES | Stayed |
| *Sancom, Inc. v. AT & T Corp.*, Civ. 08-4211-KES | Stayed |

| | |
|---|---|
| *Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services*, Civ. 07-1016-KES[4] | Stayed |
| *Sancom, Inc. v. Sprint Communications Co.*, Civ. 07-4107-KES | Stayed |
| *Sancom, Inc. v. Qwest Communications Co.*, Civ. 07-4147-KES. | Stayed |

Moreover, this court is aware of similar cases pending in other jurisdictions, many of which have been stayed pending referral of specific issues to the FCC. *See, e.g.*, *Qwest Commc'ns Co. v. Tekstar Commc'ns, Inc.*, No. 10-490, 2010 WL 2772442 (D. Minn. July 12, 2010); *All. Am. Tel. Co. v. AT&T, Inc.*, No. 07-861, 2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010); *Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co.*, No. 08-1130, 2009 WL 2155930 (D. Minn. July 14, 2009). *See also Bluegrass Tel. Co. v. Qwest Commc'ns Co.*, No. 4:09-CV-70-M, 2010 WL 1257727 (W.D. Ky. Mar. 26, 2010) (staying the case pending resolution of referrals in District of South Dakota, District of Minnesota, and Southern District of New York cases). *But see N. Cnty. Commc'ns Corp. v. Verizon Global Networks, Inc.*, 685 F. Supp. 2d 1112, 1117 (S.D. Cal. 2010) (denying motion to refer Verizon's counterclaims pursuant to primary jurisdiction doctrine).

---

[4] *Northern Valley v. MCI*, Civ. 07-1016 is consolidated with *Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services*, Civ. 07-4106.

### III.    Relevant FCC History

The FCC not only has multiple similar actions pending before it (in addition to the FCC history related to Northern Valley listed above), but also has taken various administrative actions concerning the services and technology at issue in this case. The *Farmers* line of cases is particularly pertinent to this action. *See also Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030, 1034-35 (D.S.D. 2010) (discussing the *Farmers* line of cases in detail).

In *Farmers*, Farmers & Mutual Telephone Co., an LEC, and Qwest Communications Corp., an IXC, disputed whether Qwest had to pay Farmers' billed access charges for types of services similar to those at issue here. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 22 FCC Rcd. 17973 (2007), 2007 WL 2872754 (*Farmers I*). Initially, the FCC, in addressing whether a free conference calling company is an end user for purposes of Farmers' tariff and, if not, whether Farmers can recover access charges from Qwest, ruled in favor of Farmers. *Id.* at 17986-88. The FCC later granted partial reconsideration based on Qwest's assertions that Farmers engaged in fraud and misrepresentations. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 23 FCC Rcd. 1615 (2008), 2008 WL 246393.

In *Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co.*, 24 FCC Rcd. 14801, 14812-13 (2009), 2009 WL 4073944 (*Farmers II*), the FCC found that the conference calling companies did not subscribe to the services offered under Farmers' tariff. Because the conference calling

8

companies were neither "customers" nor "end users" within the meaning of
Farmers' tariff, Farmers was not entitled to charge Qwest switched access
charges. *Id.* Thus, the FCC found that Farmers' practice of charging Qwest
access charges for the traffic from the conference calling companies was unjust
and unreasonable in violation of 47 U.S.C. § 201(b). *Id.* at 14812-13. The FCC,
however, declined to rule that Farmers was "precluded from receiving any
compensation at all for the services it has provided to Qwest." *Id.* at 14812 n.96
(citation omitted). The FCC declined Farmers' petition for reconsideration and
rejected challenges to its authority to issue *Farmers II*. *Qwest Commc'ns Corp. v.
Farmers & Merchants Mut. Tel. Co.*, 25 FCC Rcd. 3422 (2010), 2010 WL 972315
(*Farmers III*).

The Court of Appeals for the District of Columbia upheld the FCC's
reasoning in *Farmers II* and *Farmers III*. *Farmers & Merchants Mut. Tel. Co. v.
Fed. Commc'n Comm'n*, 668 F.3d 714 (D.C. Cir. 2011). In summarizing the
FCC's decision in *Farmers II*, the court reasoned that "[t]he Commission found
that in numerous respects, the conference calling contracts did not establish a
subscriber relationship under Farmers' tariff." *Id.* at 720 (internal quotation
omitted). For example, Farmers did not bill the conference calling companies,
the companies never paid access charges to Farmers, Farmers did not expect to
be paid, and the parties' relationship was not structured in a manner
consistent with Farmers' tariff. *Id.* The court also rejected Farmers' argument

9

that the FCC ignored the plain terms of its tariff that required Qwest to pay the tariffed rate regardless of whether the conference calling companies were end users. *Id.* (reasoning that "the tariff itself includes a diagram of switched access service that illustrates an end user as one of the sub-elements of that service.").

The court upheld the FCC's determination that Farmers did not provide Qwest with "switched access" pursuant to its tariff, and, therefore, Farmers was unjustly and unreasonably charging Qwest pursuant to § 201(b) and § 203(c). *Id.* at 721 (citation omitted). Thus, the court upheld the FCC's determination that the filed rate doctrine did not apply:

> Although it did not decide how traffic to the conference calling companies should be classified, the Commission based its conclusion, that in the absence of an end user such traffic did not constitute switched access service under the tariff, on the controlling plain text of Farmers' tariff. The service was outside of the tariff and, as such, the filed rate doctrine could not protect Farmers from liability to Qwest.

*Id.* at 722-23 (internal citation omitted). The court continued to leave open the question of whether and to what extent Farmers could recover compensation from Qwest.

On February 9, 2011, the FCC released a "Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking." *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 26 FCC Rcd. 4554, 2011 WL

466775. On November 28, 2011, the FCC issued its final rule concerning the services and technology at issue in this case. *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 76 Fed. Reg. 73830 (Nov. 29, 2011), 2011 WL 5909863 (to be codified at 47 C.F.R. pts. 0, 1, 20, 36, 51, 54, 61, 64, and 69) (final rule). In light of the issuance of the FCC's final rule, the court ordered further briefing on what impact, if any, the final rule has on this case. Qwest argued that the final rule required Northern Valley to revise its tariff and reduce its rates and Northern Valley should "amend its complaint to assert claims related to several unpled tariff revisions," but otherwise the final rule does not change this case. Docket 83 at 3. Northern Valley argued that the final rule validated its position, and the court could utilize the final rule in ruling on Northern Valley's summary judgment motion. Docket 75.

The final rule sets out a two-part test for determining whether an LEC is engaged in access stimulation and, if so, provides a compensation scheme. 76 Fed. Reg. at 73837. The FCC also created a transitional framework for VoIP intercarrier compensation. *Id.* at 73833. But the final rule does not state that it is retroactive, and the court will not assume that it is retroactive. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to

11

encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." (citations omitted)). Thus, the final rule is inapplicable to the time period before it became effective.

## DISCUSSION

"Primary jurisdiction 'is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a referral to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.' " *United States v. Rice*, 605 F.3d 473, 475 (8th Cir. 2010) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)). "The doctrine 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' " *Id.* (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)). "Primary jurisdiction 'promotes uniformity, consistency, and the optimal use of the agency's expertise and experience.' " *Id.* (quoting *United States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005)).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction. *Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998) (citing *W. Pac.*, 352 U.S. at 64). Instead, the court considers "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created." *Id.* (citing

12

*United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984)). The Eighth Circuit has identified two main reasons and purposes for the doctrine. *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation omitted). First, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion[.]" *Id.* (internal quotation omitted). Second, the "promotion of consistency and uniformity within the areas of regulation[.]" *Id.* (citation omitted); *see also Rice*, 605 F.3d at 475 ("Primary jurisdiction 'promotes uniformity, consistency, and the optimal use of the agency's expertise and experience.' " (quoting *Henderson*, 416 F.3d at 691)). "The doctrine of primary jurisdiction . . . should seldom be invoked unless a factual question requires both expert considerations and uniformity of resolution." *McDonnell Douglas*, 751 F.2d at 224 (quotations omitted). When the primary jurisdiction doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Access Telecomms.*, 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

The primary jurisdiction doctrine should be applied when the reasons for the doctrine are present even if the parties have not raised the issue. This is because "the doctrine exists for the proper distribution of power between

13

judicial and administrative bodies and not for the convenience of the parties."

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988).

In prior orders, this court has generally referred three issues to the FCC: (1) whether the CLEC or LEC is entitled to collect interstate switched access charges it has billed to the IXC for calls to numbers assigned to free calling providers; (2) in the event the services provided by the CLEC or LEC to the IXC do not qualify as switched access service under the CLEC's or LEC's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether the CLEC or LEC is entitled to obtain compensation for these services; and (3) in the event that the services provided by the CLEC or LEC to the IXC do not qualify as switched access service under the CLEC's or LEC's applicable interstate access tariff, but the CLEC or LEC is otherwise entitled to compensation for these services, determination of a reasonable rate for these services. *See, e.g.*, *Sancom*, 696 F. Supp. 2d at 1036.[5] In *Sprint II*, at Sprint's

---

[5] The court has issued a number of almost-identical orders staying similar cases pending referral to the FCC. *See, e.g.*, *Splitrock Props., Inc. v. Sprint Commc'ns Co.*, No. Civ. 09-4075-KES, 2010 WL 1329634 (D.S.D. Mar. 30, 2010); *Splitrock Props., Inc. v. Qwest Commc'ns Corp.*, No. Civ. 08-4172-KES, 2010 WL 2867126 (D.S.D. July 20, 2010); *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010); *Sancom Inc. v. Sprint Commc'ns Co.*, No. Civ. 07-4107-KES, 2010 WL 936718 (D.S.D. Mar. 15, 2010); *Sancom, Inc. v. Qwest Commc'ns Corp.*, No. Civ. 07-4147, 2010 WL 960005 (D.S.D. Mar. 12, 2010). For simplicity, the court will refer to its previous orders with a single

request, the court referred two additional issues: (1) Whether the pre-June 7, 2011, payments by the conference calling companies constitute payments under Northern Valley's revised tariff number three; and (2) Whether Northern Valley can collect access service charges from Sprint under all versions of its tariff number three as the tariff defines "customer," "buyer," and "service."

Qwest and Northern Valley argue that this court should not stay and refer this case to the FCC and, alternatively, that this court should delay referral until the parties have completed fact discovery. The court finds that the reasons for applying the primary jurisdiction doctrine are present and that applying the doctrine will aid the purposes for which the doctrine was created. Because the tariff at issue in this case (tariff number three) is the same tariff at issue in *Sprint II*, the court will refer the same five issues in this case as it referred in *Sprint II*.

I.    **Motion to Seal**

As a preliminary matter, Qwest moves to seal Northern Valley's response to Qwest's interrogatory number four and the accompanying affidavit of attorney Christopher W. Madsen. Docket 96. It is unlikely that Northern Valley will oppose this motion because it originally designated its response to Qwest's interrogatory number four as confidential. Docket 96 at 2. The motion to seal is granted.

---

citation to *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010).

II.   **Application of Tariffs**

The first issue the court considers referring to the FCC is the question of whether the services that Northern Valley provides with respect to the free calling provider traffic qualify as "switched access service" within the meaning of Northern Valley's tariff number three. This is essentially a tariff interpretation and enforcement question.

An action to enforce a tariff is properly brought before a district court. *Access Telecomms.*, 137 F.3d at 609; *see also United States v. Great N. Ry. Co.*, 337 F.2d 243, 246 (8th Cir. 1964) ("Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." (citation omitted)). But " 'where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." *Access Telecomms.*, 137 F.3d at 609 (quoting *W. Pac.*, 352 U.S. at 66). "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " *W. Pac.*, 352 U.S. at 66 (quoting *Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291 (1922)).

16

If the interpretation of the tariff is straightforward, then courts do not apply the primary jurisdiction doctrine. *See, e.g.*, *GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1264 (9th Cir. 2011) (reasoning that referral was not appropriate because "the basic compensation concept, with all of its complexity, is not before us. What is before us is the relatively easier task of construing the language of the FCC orders."); *Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 223 (2d Cir. 1995) (reasoning that application of the primary jurisdiction doctrine was unnecessary because the case did "not present any issues involving intricate interpretations or applications of tariffs that might need the FCC's technical or policy expertise.").

Contrastingly, if the case requires interpretation of technical terms or specialized knowledge, then referral is appropriate under the primary jurisdiction doctrine. *See, e.g.*, *Access Telecomms.*, 137 F.3d at 609 (reasoning that referral was appropriate because the issue required the FCC to determine the reasonableness of a telecommunications practice); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (reasoning that referral was proper because Congress specifically delegated responsibility to the FCC to define the type of services that were at issue in that case); *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006) (reasoning that "the interpretation of an agency order issued pursuant to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction where the

17

order reflects policy concerns or issues requiring uniform resolution." (citing *Serv. Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 177 (1959); *Rilling v. Burlington N. R.R. Co.*, 909 F.2d 399, 401 (9th Cir. 1990)). *See also In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) ("Instead of trying to divine how the FCC would resolve the ambiguity . . . we think it best to send this matter to the Commission under the doctrine of primary jurisdiction.").

Northern Valley argues that because its revised tariff number three has deemed lawful status, the court can rule on its pending summary judgment motion by interpreting the plain meaning of the tariff. But Northern Valley cites to no FCC precedent, and the court has found no precedent, enforcing all the terms of a CLEC's interstate access tariff for calls made to free conference calling services. Instead, throughout various orders and the final rule, the FCC has announced piecemeal rules and definitions for these types of tariffs. Creating a uniform system of rules regarding the type of cases is within the FCC's expertise, not the court's expertise.

Qwest argues that referral to the FCC is unnecessary because the conference calling companies do not purchase interstate access services pursuant to a tariff from Northern Valley. The FCC has ruled that an "end user" must purchase interstate access services from the CLEC: "The Commission's rules governing these tariffs provide that ILECs may recover access service costs through charges assessed on both IXCs and 'end users.'

18

These rules have . . . defined 'end user' as any customer of an interstate or foreign telecommunications service that is not a carrier." *Qwest v. Northern Valley I*, 26 FCC Rcd. at 8334 (internal quotation and footnotes omitted).

Northern Valley's definition of end user appears to comply with *Qwest v. Northern Valley I*:

> The term "end user" means any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an 'End User' when such carrier uses a Telecommunications service for administrative purposes and a person or entity that offers Telecommunications services exclusively as a reseller shall be deemed to be an 'End User' if all resale transmissions offered by such reseller originate on the premises of such reseller. An End User must pay a fee to the Company for telecommunications service. Other carriers, including IXCs, are not considered to be End Users under the terms of this Tariff, unless the Company consents to such classification in writing.

Docket 30-6 at 10. Northern Valley, however, has acknowledged that the conference calling companies do not purchase interstate access services; instead, the conference calling companies utilize Northern Valley's local services pursuant to agreements made under South Dakota law. *See* Docket 81 at 14 ("While Qwest is a customer of the interstate access tariff, the relationship between Northern Valley and the conference calling services are not governed by that tariff or by Section 203(c). Instead, the provision of local exchange services to end user customers is governed by state law."). This appears to be consistent with Northern Valley's definition of "volume end user"

19

in its revised tariff number three, which broadly states "services" instead of "interstate access services:"

> An End User that obtains Service from the Company in order to provide high-traffic services, including, but not limited to, chat line services, conference calling services, help desk assistance, or call center support, designates the Company's central office as its EDP, and accordingly, installs equipment in the Company's central office. Because of the high-volume of traffic generated to and from VEUs, origination and termination of switched access services to this class of End User will be assessed at a lower composite rate, as outlined in Section 7.2.2 of this Tariff.

Docket 30-6 at 12.

Qwest contends that the court would only reach the "volume end user" portion of Northern Valley's tariff if the court found that the conference calling companies were "end users" because the "volume end user" definition is only applied to determine the rate if an end user subscribes to Northern Valley's services. Docket 95 at 14. Qwest contends that because the conference calling companies do not purchase interstate access services from Northern Valley, they cannot be a "volume end user." Docket 95 at 13.

One of the most glaring areas in need of the FCC's expertise is Northern Valley's definition of "end user" and "volume end user" in its tariffs. The FCC will need to carefully parse the terms used in Northern Valley's tariff number three to determine whether the tariff applies to calls to conference calling companies that utilize Northern Valley's local, but not interstate, services. The interpretation of "volume end user" and "end user" in tariff number three, as it

has progressed over a series of revisions, is a task within the FCC's unique expertise. *See, e.g., AT&T Corp. v. Y'Max Commc'ns Corp.*, 226 FCC Rcd. 5742, 5747-48 (2011), 2011 WL 1361436 (interpreting "end user" when the LEC billed the IXC access charges for calls made through a MagicJack device that allows a person to make a phone call over the internet); *Sancom*, 696 F. Supp. 2d at 1038 ("The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional agreement for the provision of tariffed access services because of the FCC's experience in the field.").

Assuming, without deciding, that Qwest's interpretation is correct and the conference calling companies do not subscribe to services in Northern Valley's interstate access tariff number three because they purchase local, not interstate services, the FCC has repeatedly reasoned that a CLEC or an LEC may be entitled to recover some payment for these services. *See, e.g., Farmers II*, 24 FCC Rcd. at 14812 n.96 (declining to rule that the LEC was precluded from receiving any compensation for the services it provided to the IXC even if the services were not interstate access services); *Qwest Commc'ns v. Farmers & Merchants*, 668 F.3d at 724 (discussing *Farmers II* and reasoning that while the filed rate doctrine did not apply, the FCC left open the question of how services for conference calling companies should be classified). Even after the FCC issued its final rule, the FCC's prior orders on the types of

21

services at issue here remained valid. *See, e.g.,* In the Matter of Connect America Fund, 2012 WL 363934, at *7 n.69 (Feb. 3, 2012) (reasoning that the FCC's previous decisions on access stimulation remained valid, and the final rule should not be interpreted as overturning or superseding those decisions).

As noted by various courts, "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency." *All. Am. Tel.*, 2010 WL 7526933, at *1; *see also Sancom*, 696 F. Supp. 2d at 1043 (same); *Bluegrass Tel.*, 2010 WL 1257727, at *2 (same). *See also Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1121 (D.C. Cir. 1992) (reasoning that the FCC is in the better position to resolve conflicting policies in the telecommunications arena). The area is even more in flux after the FCC announced its final rule, which, through a later clarification, upheld the FCC's prior orders, but did not provide analysis on how, if at all, a CLEC should be compensated for the services at issue here for the time period before the final rule became effective. Because the FCC's input on the tariff application, classification of services, and reasonable rate issues may inform the court's analysis of this case going forward, the court will refer the following issue to the FCC:[6] If the services

---

[6] The court has referred an almost identical issue in other cases. *See, e.g., Sancom*, 696 F. Supp. 2d at 1043 ("In the event that the services provided by Sancom to AT & T, by which calls placed by AT & T's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination

provided by Northern Valley do not qualify as switched access services to companies that provide free conferencing calling services, then determination of how the traffic should be classified, whether that traffic can be tariffed, and whether Northern Valley is entitled to any compensation for the services Northern Valley provided, and if so, what a reasonable rate would be for Northern Valley's services.

Moreover, because the FCC, not the court, determines the rate for telecommunication services, the FCC should determine what rate applies to services provided by Northern Valley if the services are not switched access services. Northern Valley agrees that the court could need guidance from the FCC in the event the court grants Northern Valley's summary judgment motion either in part or in whole, but it contends that the court should wait until that time. *See* Docket 97 at 15 ("Northern Valley acknowledges that the Court may continue to need additional guidance with regard to . . . alternative recovery issues. However, the potential need for this guidance in the future does not necessitate a referral at this time.").

Before the court could even reach the possibility of awarding a remedy in this case, including any alternative recovery theory, the court would need to interpret the terms of Northern Valley's tariff number three. But, as stated

_____

of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.").

above, interpretation of the tariff's terms requires the FCC's technical expertise. Thus, as in the other cases,[7] the court will refer an issue about rate making to the FCC: In the event that the services provided by Northern Valley to Qwest do not qualify as switched access services under Northern Valley's interstate tariff number three or interstate revised tariff number three, but Northern Valley is otherwise entitled to compensation for these services, then what is a reasonable rate for these services.

## III.   Additional Issues from *Sprint II*

In addition to the three issues outlined above that the court has repeatedly referred to the FCC, in *Sprint II*, Sprint requested that two other issues be referred to the FCC. *See Sprint II*, No. 11-4053, Docket 59 at 10. Because the tariff at issue here is the identical tariff at issue in *Sprint II*,[8] the court will refer the two additional issues from *Sprint II* to the FCC: (1) Do the pre-November 29, 2011, payments by the conference calling companies constitute payments under Northern Valley's revised tariff number three; and

---

[7] *Sancom*, 696 F. Supp. 2d at 1043 ("In the event that the services provided by Sancom to AT & T, by which calls placed by AT & T's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.")

[8] The court finds that, during discovery, the same issues articulated by Sprint may become issues in this case. The court finds that the reasons articulated in *Sprint II*, Docket 59 at 8-11, support referring these two additional issues to the FCC.

(2) Whether Northern Valley can collect access service charges from Qwest under all versions of its tariff number three because of the tariff's definitions for "customer," "buyer," and "service."

**IV.     Request to Delay Referral**

In the event that the court stays and refers this case, Northern Valley requests that the court allow discovery to be completed in *Sprint II* before it enters the primary jurisdiction referral to the FCC. Northern Valley contends that the FCC prefers to focus on a lead case and that waiting until discovery is completed will allow *Sprint II* to be the lead case and resolve the referred issues more quickly. Qwest requests that the court delay any referral to the FCC until the parties have completed fact discovery.

The court does not consider the regulatory agency's discovery rules and pleading requirements in applying the primary jurisdiction doctrine. *See Access Telecomms.*, 137 F.3d at 608 (explaining that the primary jurisdiction doctrine should be applied when the issue calls for expert consideration and uniformity within the field of regulation). "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial, and the application of the doctrine properly may be determined on the pleadings." *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006).

25

The parties cite no FCC precedent stating that the FCC requires parties to have completed discovery before addressing issues in a referred case. Instead, the parties rely on the fact that the FCC chose a certain case, *Sancom v. Qwest*, as the lead referral in an earlier set of referred cases, which included *Sprint I*, because discovery was complete in that case. The fact that the FCC "designated the case in which discovery was complete as the lead case does not suggest that completed discovery was necessary for the FCC to proceed." *Splitrock*, 2010 WL 2867126, at *12. "Indeed, the FCC did not require that the case in which discovery was complete be designated as the lead case, but rather ordered the IXCs to 'decide amongst themselves which IXC [would] be the complainant in the proceeding.' " *Id.* (citing Letter by Deputy Chief, Market Disputes Resolution Division, Enforcement Bureau, Docket 80-1 at 3 (released May 5, 2010); Letter by Deputy Chief, Market Disputes Resolution Division, Enforcement Bureau, Docket 80-1 at 6 (June 2, 2010) (noting that IXCs indicated that they had agreed that Qwest would file the formal complaint)).

Moreover, Northern Valley moved for summary judgment before completing the discovery that it now wishes to conduct. Docket 23. About a month later, Qwest moved for partial summary judgment on three of its counterclaims without conducting the discovery that it now seeks permission to complete before referral to the FCC. Docket 37. Neither party has articulated a reason why discovery is necessary before referral to the FCC but not

26

necessary for the court to rule on the pending summary judgment motions. The parties' positions are contrary to the law, which dictates precisely the opposite outcome: discovery may be necessary prior to the court considering the summary judgment motions, as there can be no genuine disputes of material fact for summary judgment to be proper, but as discussed above, discovery need not be completed prior to referral to the FCC. In any event, the court will not delay referral to the FCC to allow the parties to complete discovery because discovery can be completed under the FCC's discovery rules,[9] and because the primary jurisdiction doctrine does not require discovery to be complete before a case is referred.

## CONCLUSION

Pending before the court are Northern Valley's motion for summary judgment, Qwest's cross motion for partial summary judgment, Northern Valley's motion to strike Qwest's statement of material facts, Northern Valley's motion to dismiss Qwest's counterclaims, and Qwest's motion to seal certain documents. Before the court addressed these motions, it ordered the parties to brief whether this case should be stayed and certain issues referred to the FCC for resolution. Qwest and Northern Valley argue that the court should not stay

---

[9] Moreover, discovery is almost complete in *Sprint II*, some of which will be applicable here, and discovery was partially completed in *Northern Valley v. Qwest I*, which should expedite the discovery process before the FCC.

27

and refer this case and, alternatively, to delay referral until the parties have completed at least some discovery.

The motion to seal is granted and the remaining motions are denied without prejudice. Because the primary jurisdiction doctrine supports a stay and referral in this case, the court will stay and refer this case and will not delay referral until the parties complete discovery. If the other pending motions are still relevant after the FCC has made its final determination on referral, the parties may resubmit their motions. Accordingly, it is

ORDERED that plaintiff's motion for summary judgment (Docket 23) is denied without prejudice.

IT IS FURTHER ORDERED that defendant's cross motion for partial summary judgment (Docket 37) is denied without prejudice.

IT IS FURTHER ORDERED that plaintiff's motion to strike defendant's statement of material facts (Docket 50) is denied without prejudice.

IT IS FURTHER ORDERED that plaintiff's motion to dismiss defendant's counterclaims (Docket 80) is denied without prejudice.

IT IS FURTHER ORDERED that defendant's motion to seal (Docket 96) is granted.

IT IS FURTHER ORDERED that this action is STAYED pending (1) resolution of the dispute by agreement of the parties; (2) a decision on the

disputed issues by the FCC pursuant to the referral described below; or

(3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for

resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Northern Valley and Qwest, Northern Valley is entitled to collect interstate switched access charges that it has billed to Qwest pursuant to Northern Valley's interstate access tariff number three or revised interstate access tariff number three for calls to numbers assigned to free calling providers.

(2)     If the services provided by Northern Valley do not qualify as switched access services to companies that provide free conference calling services, then determination of how the traffic should be classified, whether that traffic can be tariffed, and whether Northern Valley is entitled to any compensation for the services Northern Valley provided, and if so, what a reasonable rate would be for Northern Valley's services.

(3)     In the event that the services provided by Northern Valley to Qwest do not qualify as switched access services under Northern Valley's interstate tariff number three or interstate revised tariff number three, but Northern Valley is otherwise entitled to compensation for these services, then what is a reasonable rate for these services.

(4)     Do the pre-November 21, 2011, payments by the conference calling companies constitute payments under Northern Valley's revised tariff number three?

(5)     Whether Northern Valley can collect access service charges from Qwest under all versions of its tariff number three because of the tariff's definitions for "customer," "buyer," and "service."

IT IS FURTHER ORDERED that Qwest will contact the Market Disputes

Resolution Division of the FCC to obtain guidance regarding the appropriate

29

method for bringing this matter before the FCC. Qwest will initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order. Qwest is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties will submit a joint report to the court every three months describing the status of the proceeding before the FCC, the first of which will be filed no later than three months from the date of this order.

Dated March 23, 2012.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE